UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: Pride Aircraft, Inc., | ) | Bankruptcy No.  20-81435 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | Judge Lynch |
| | ) | |

MEMORANDUM OPINION

Before the court is a Motion for Relief from the Automatic Stay filed by the Greater Rockford Airport Authority ("GRAA") pursuant to section 362(d)(1) of the Bankruptcy Code seeking permission to pursue an eviction of the Debtor, Pride Aircraft, Inc., from the airport grounds. (ECF No. 25.)  Pride Aircraft currently occupies certain real property located at the Greater Rockford Airport, designated as "Aviation Plot No. 28," as its principal place of business.  The Debtor claims a right to do so on the basis of a sublease from HSI Investments, LLC Series No. 3 ("HSI").  HSI became the direct tenant of Plot No. 28 in 2002 when the prior tenant, Aero-Taxi Rockford, Inc., assigned its interest under a lease for the plot to HSI.  On the same date, GRAA, as owner and landlord, consented to the assignment and acknowledged the sublease to the Debtor.

The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on August 11, 2020, electing to proceed under subchapter V as a small business debtor.  GRAA alleges that the lease to HSI terminated pre-petition, thereby

extinguishing any right of the Debtor to occupy Plot No. 28 and foreclosing the Debtor from assuming the lease under section 365(a) of the Bankruptcy Code, and seeks relief from the automatic stay to evict the Debtor from the property.[1] The Debtor and the Subchapter V Trustee object to the motion, in part arguing that the lease, if terminated, was terminated after the petition was filed and in violation of the automatic stay.

The court held an evidentiary hearing and, after weighing the evidence presented at trial, concludes that the lease from GRAA to HSI of Plot No. 28 terminated pre-petition. The court further finds the Debtor failed to demonstrate that it has a continuing right to occupy the property. Accordingly, GRAA's motion for relief from stay to seek to evict the Debtor from Plot No. 28 is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Many of the relevant facts are not in dispute. The Debtor and GRAA have stipulated for purposes of this motion that GRAA is the owner and operator of Plot No. 28, that GRAA leased Plot No. 28 to Aero-Taxi Rockford, Inc. in 1984 and extended that lease through April 2024. (Stipulation, ECF No. 81.) On or about December 12, 2002, Aero-Taxi assigned its interest in the Net Ground Lease of Plot No. 28 to HSI, and with GRAA's written consent, HSI then subleased the plot to the Debtor. (*Id.*) The parties further stipulate that "HSI Investments was in default

---

[1] GRAA's Motion seeks relief to "proceed with its rights and remedies with respect to" both Aviation Plot No. 28 and Aviation Plot No. 19, another plot at the Greater Rockford Airport leased to HSI and subleased to the Debtor. (ECF No. 25.) However, during closing argument held on October 23, 2020, counsel for the Debtor conceded that the Debtor had abandoned any interest it claimed in Plot No. 19 as part of a "property swap" with the Authority in 2019 to lease a different parcel. Counsel for GRAA stated further that his client does not seek stay relief with respect to Plot No. 19.

under the terms of [the Plot No. 28 lease] by failing to make the required rental payments to GRAA under said Net Ground Lease since April 2020." (*Id.*) They agree that "[w]ritten notice from GRAA to HSI Investments of its default under [the Plot No. 28 lease] and GRAA's intent to terminate said leases if the default wasn't cured was sent on April 30, 2020." (*Id.*) They also stipulate that representatives for GRAA and HSI executed a termination of lease agreement with respect to the Plot No. 28 lease. (*Id.*)

The primary factual dispute at trial concerns the date and effectiveness of that "Termination of Lease Agreement." (Movant Ex. 6.) The termination agreement states that it "shall be effective as of June 1, 2020," but then also states that, "[p]rovided that prior to July 31, 2020 Landlord receives a Phase II Environmental Assessment Report for the Property ('Phase II Report') from an engineering firm licensed in the State of Illinois, satisfactory to Landlord in its sole discretion, then . . . the Leases shall be considered terminated effective as of June 1, 2020." (*Id.*) The agreement recites that "the parties hereto have caused this Agreement to be executed as of the date first above written," which appears to refer to the June 1, 2020 date mentioned in the first line of the agreement. (*Id.*) It is signed by Patti Watkins as manager of HSI and by Michael Dunn as executive director of GRAA. However, below Ms. Watkins' signature is the date August 3, 2020, while under Mr. Dunn's signature is the date August 12, 2020. Because August 12 was one day after the Debtor filed its bankruptcy petition, the Debtor argues that the termination agreement is void or voidable.

Three witnesses testified at trial: Zach Oakley, director of operations at GRAA; Andrew Gilmore, Pride's quality control manager; and John Morgan, the Debtor's president and sole owner. Mr. Oakley testified without contravention that GRAA received an environmental report with respect to Plot No. 28 by July 31, 2020. No one disputes that Ms. Watkins signed the termination agreement on the date stated under her name, August 3, 2020. Mr. Oakley testified that the delay in GRAA signing the agreement was because GRAA "did not receive it back from HSI" immediately. Mr. Oakley testified that HSI sent the agreement executed by HSI to GRAA's counsel, who forwarded it to Mr. Oakley and Mr. Dunn by e-mail on August 11, 2020. Mr. Dunn signed it on August 12, 2020. Mr. Oakley testified that he personally did not learn of the Debtor's bankruptcy petition until August 12, 2020, but was unaware if or when others at GRAA had learned of it.

## DISCUSSION

Section 362(a) of the Bankruptcy Code provides that a bankruptcy petition operates as a stay "applicable to all entities, of", among other acts, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy case] or to recover a claim against the debtor that arose before the commencement of" the bankruptcy case. 11 U.S.C. §362(a)(1). Section 362 also stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay is "one of the

fundamental debtor protections provided by the bankruptcy laws." *In re Fulton*, 926 F.3d 916, 927 (7th Cir. 2019) (quoting *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986)). A primary purpose of the automatic stay in chapter 11 "is to afford debtors in Chapter 11 reorganizations an opportunity to continue their businesses with their available assets." *United States v. Ruff (In re Rush-Hampton Indus.)*, 98 F.3d 614, 616 (11th Cir. 1996) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 183 (1977)).

The Bankruptcy Code authorizes creditors or parties with an interest in property to seek relief from the automatic stay, such as when the movant's interest in property is not adequately protected or when the property has no value to the estate and is not necessary for reorganization. GRAA principally relies upon section 362(d)(1) by which a party in interest may seek relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. §362(d)(1). Section 362(g) of the Bankruptcy Code allocates the burden of proof for motions for stay relief, providing that "(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues." 11 U.S.C. § 362(g).

Section 365 of the Bankruptcy Code authorizes a chapter 11 debtor in possession to assume unexpired leases under certain conditions, but not if "such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief." 11 U.S.C. § 365(c)(3). It is not

disputed that the property in question is nonresidential real property. GRAA alleges that its lease of Plot No. 28 to HSI terminated prior to the order for relief and that such termination extinguished any right that the Debtor had to possess the plot under its sublease. GRAA argues that because the Debtor had no right to possess the property and no power under the Bankruptcy Code to cure, reinstate or assume a terminated lease or sublease, the property is of no use or value to the estate or the Debtor's reorganization and it should be allowed to proceed with its remedies to evict the Debtor.

The Bankruptcy Code does not specifically define what constitutes "cause" for stay relief. GRAA seeks in its motion to "proceed with its rights and remedies under [its Net Ground Lease of Plot No. 28 to HSI] against the Debtor, including but not limited to, eviction of the Debtor from [Plot No. 28.]" (Motion ¶ 22, ECF No. 25.) In deciding whether to lift the stay to permit non-bankruptcy litigation against or involving the debtor to proceed, the Seventh Circuit employs a three-factor test to determine whether "cause" exists, asking whether:

> a) Any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit,
>
> b) the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor, and
>
> c) the creditor has a probability of prevailing on the merits.

*In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991). If GRAA means to pursue money damages against the Debtor individually, it has not explained why such matter cannot be adjudicated through the claims administration process in

Page **6** of **16**

the bankruptcy case, nor has it demonstrated a probability of prevailing on such claim. On the other hand, if GRAA seeks only *in rem* relief from Plot No. 28 or the eviction of the Debtor from that real property, the Seventh Circuit and other courts within the circuit have found that pre-petition termination of a leasehold interest with no ability to revive and assume the lease constitutes "cause" to lift the stay with respect to such property. *See Robinson v. Chi. Hous. Auth.*, 54 F.3d 316, 318 (7th Cir. 1995) (affirming order lifting stay to pursue eviction proceedings where "lease was not 'unexpired' and thus was not assumable"); *Cunningham v. Lifelink Corp.*, 159 B.R. 230 (N.D. Ill. 1993) (affirming stay relief where residential lease was terminated pre-petition); *In re Maxwell*, 40 B.R. 231, 237 (N.D. Ill. 1984) (finding "limited equitable interest" of debtor in possession in commercial real estate under tenancy at sufferance post-termination of the lease to be protected by the stay, but stay lift was warranted because the lease was terminated pre-petition and could not be resurrected or assumed under section 365).

The "federal law allowing 'unexpired' leases to be assumed calls for a determination whether a lease has ended under state law." *Robinson*, 54 F.3d at 320. The property at issue here is real estate located in Illinois, and at closing argument none of the parties disagreed that the relevant leases are governed by Illinois law. The Seventh Circuit in *Robinson* questioned the district court's conclusions in *Maxwell* and *Cunningham* that a notice of default and expiration of the cure period by themselves were sufficient to terminate the leases at issue under Illinois law, "on the grounds that Illinois law may extend protection of the tenant even farther and

Page **7** of **16**

that a lease may not end until a judgment of possession has been entered." *Id.* at 322 But, here, GRAA does not merely rely on termination due to payment default. Instead, GRAA and HSI, the two parties to the Net Ground Lease of Plot No. 28, agreed to the termination of the lease through their written lease termination agreement. (Movant Ex. 6.)

The Debtor and the Trustee argue that the lease termination agreement did not become effective until signed by GRAA post-petition. However, this court concludes from the evidence presented that the termination agreement came into effect before the document was signed by GRAA and before the petition date. Execution of a written agreement by both parties is not always required to form an agreement. Instead, in "Illinois, an offer, an acceptance and consideration are the basic ingredients of a contract." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 712 (7th Cir. 2019) (quoting *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135 (2006)). In *Gupta*, the Seventh Circuit addressed whether an arbitration agreement arose from an employer's e-mail to employees describing an arbitration program which was mandatory unless the employee individually elected to opt out. The Seventh Circuit found that the email constituted a contract offer that was accepted by the employee's continued employment without more, forming a valid and enforceable arbitration agreement. *Id.* This court finds here that, like the e-mail in *Gupta*, GRAA's preparation and delivery of the proposed lease termination agreement to HSI constituted an offer whose acceptance HSI objectively manifested by signing the document without modification. Under Illinois law, at that point the

parties had demonstrated their mutual assent to the terms of their termination agreement, which was sufficient to create an enforceable contract. *See AGA Shareholders, LLC v. CSK Auto, Inc.*, 467 F. Supp. 2d 834, 846 (N.D. Ill. 2006).

At first glance, a recent Illinois appellate court decision seems to suggest that the existence of a signature block for GRAA implies that its signature was necessary for the termination agreement to have effect. In *Adames v. Florey (In re Estate of Adames)*, the court concluded that a signature was a condition precedent to the effectiveness of a settlement agreement in part based on the document including a separate signature line for each party. 2020 IL App (1st) 190573, ¶ 54. But the *Adames* court did not set out a bright-line rule that signatures are always necessary. *Id.* ¶48 (citing *S.N. Nielsen Co. v. Nat'l Heat & Power Co.*, 32 Ill. App. 3d 941, 946 (1975)). To the contrary, the court recognized that "[w]hether signing an instrument is a condition precedent to that instrument becoming a binding contract usually depends on the intent of the parties." *Id.* (citing *Lynge v. Kunstmann*, 94 Ill. App. 3d 689, 694 (1981). The court also noted that "a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it," and whether signature is necessary to the formation or performance "depends upon the facts of the case." *Id.* (citing *Landmark Properties, Inc. v. Architects Int'l-Chi.*, 172 Ill. App. 3d 379, 383 (1988)). Indeed, as the Illinois Supreme Court has noted, "[t]he fact that parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations" though "parties may specifically provide that

negotiations are not binding until a formal agreement is in fact executed." *Chi. Inv. Corp. v. Dolins*, 107 Ill. 2d 120, 126-27 (1985).

Further, the facts in *Adames* are distinguishable from the present case in a number of respects. First, there were more than two parties to the agreement in *Adames* and their agreement was a result of extensive negotiations, for which there was "numerous e-mail correspondence between the parties" indicating that a tentative agreement was "subject to agreement on final documentation." *Adames*, 2020 IL App (1st) 190573, ¶ 50. Additionally, the party whose signature was missing from the agreement in *Adames* was not the one who had drafted the instrument, but rather was the recipient counterparty. As such, the delivery of the document in *Adames* could not serve as a manifestation of the unsigned party's assent. Addtionally, in *Adames* the court found that upon reviewing the proposed agreement "Florey . . . decided not to sign, and in fact expressly rejected the terms of the settlement agreement." *Id.* ¶ 47. In contrast, here, notwithstanding the signature block, there is no evidence that when GRAA presented the proposed termination agreement to HSI it intended its own subsequent execution of the document to be a condition precedent to its effectiveness, as opposed to a mere formality to create a clear record of the agreement already assented to by the parties.

Because the court finds that the lease of Plot No. 28 from GRAA to HSI terminated pre-petition, it need not determine whether the termination violated the automatic stay. The termination of the lease extinguished HSI's right to possess Plot No. 28 and with that, the Debtor's possessory interest in the parcel which had flowed

from HSI's lease interest. The Debtor has not demonstrated that GRAA agreed to assume the sublease to Pride Aircraft. Nor has it offered proof that supports any other theory by which it may claim to enjoy a continuing right to occupy Plot No. 28 following the termination of the HSI Net Ground Lease. *See, e.g., Arendt v. Lake View Courts Associates*, 51 Ill. App. 3d 564, 566 (1977) (explaining that a subtenant "possesses only the rights of [the original] tenant and nothing more" and therefore "the termination of such top lease *ipso facto* works a termination of a sublease"). *Cf. Kallman v. Radioshack Corp.*, 315 F.3d 731, 737 (7th Cir. 2002) (distinguishing the case where "the parties have specifically included language in the contract to preserve" the rights of sub-tenants).

Notably, the evidence presented at trial suggests that the Debtor's sublease from HSI may have also expired or terminated before this bankruptcy commenced. The testimony of the Debtor's president indicates that between 2002 and 2007, HSI and the Debtor operated under an oral sublease before executing a written sublease in December 2007. That written sublease incorporated the terms of a December 2007 sheet entitled "Basic Lease Information," which stated that the term of the sublease was 12 months, ending on December 15, 2008. While the lease provided for the possibility of one-year extensions if Pride gave HSI written notice at least 90 days in advance of the expiration date, the Debtor's president testified that Pride had never provided HSI written notice of its intent to extend the sublease.

In its response to the Motion, the Debtor raises several potential state law claims against GRAA, but does not explain why any of them would entitle it to

continued possession of Plot No. 28 or otherwise provide a defense to stay relief.  First, the Debtor argues that the Debtor is a "third party beneficiary" of the assignment of the lease from Aero-Taxi to HSI, citing *May's Family Centers, Inc. v. Goodman's Inc.*, 571 F. Supp. 1012 (N.D. Ill. 1983).  In that case a sublessee filed a complaint against the sublessor's landlord after the landlord allegedly refused to permit a further assignment of the sublease and then told the prospective assignee it would not consent.  The sublessee argued that the landlord's acts were a breach of specific lease provisions that contemplated multiple sublease agreements would be made with respect to which the lessor's consent to assignment would not be unreasonably withheld.  The court denied the landlord's motion to dismiss the tortious interference claim under Rule 12(b)(6), holding that because the original lease contemplated the multiple subleases, the plaintiff was deemed an intended beneficiary of that lease provision and stated a claim.  Pending before this court, however, is only the request for stay relief to enable GRAA to pursue its claimed rights to the parcel and not an action for breach of the lease, a matter that would likely have to be brought in an adversary proceeding. Fed. R. Bankr. P. 7001(1).  As the Seventh Circuit has emphasized, hearings on motions for stay relief are expedited proceedings and the

> only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay.  This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters.  Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be.

*In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990) (quoting H. R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977)).

Further, putting aside for the moment whether the Debtor can even demonstrate its standing as a third-party beneficiary of the already-terminated Net Ground Lease, it fails to explain how an action for breach of such lease agreement can undo the extinguishment of its possessory rights as the sublessee to the terminated lease between GRAA and HSI. The Debtor does not explain how any claim for breach of contract that it may have would enable it to revive its possessory interest under the sublease or compel GRAA and HSI to permit it to continue to occupy Plot No. 28. Therefore, without prejudice to the issue of whether the Debtor may have a claim against GRAA or HSI as a third-party beneficiary, the court finds that the Debtor has failed to demonstrate that any such claim would warrant denial of the motion for stay relief.

Next, the Debtor argues that it may have a claim against GRAA for tortious interference with contract. The Debtor does not articulate this theory very clearly, but the gist of it seems to be based on the "property swap" that occurred in October 2019, where GRAA allegedly induced the Debtor to abandon the Debtor's use of Plot No. 19 as a warehouse with the promise of free rent at another location and assurances that GRAA would "work it out" with HSI. But, like for the Debtor's breach of contract / third-party beneficiary theory, the court need not reach the merits of this assertion in ruling on the motion for stay relief. Any such tort claim also would have to be brought in an adversary proceeding. Fed. R. Bankr. P. 7001(1). Nor has the

Debtor explained how the claim, even if supportable, furnishes it with a continuing right to possess Plot No. 28, revive the lease from GRAA to HSI or compel HSI to extend its sublease of the property. Therefore, without prejudice to the issue of whether the Debtor may have a claim against GRAA or HSI for tortious interference with contract, the court finds that the Debtor has failed to demonstrate that any such claim would warrant denial of the motion for stay relief.

Finally, the Debtor argues that stay relief should be denied because, in its words, "GRAA and Pride negotiated a novation by reason of the property swap between those two parties" in October 2019. According to this theory, the Debtor abandoned its use of Plot No. 19 and was instead able to use an alternative location free of rent. (ECF No. 55.) A "novation is the substitution of a new obligation for an existing one, which is thereby extinguished." *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 887 (7th Cir. 2005) (citing *Faith v. Martoccio*, 21 Ill. App. 3d 999 (1974)). To establish novation, the party asserting the defense must prove by a preponderance of the evidence: "[1] a previous, valid obligation; [2] a subsequent agreement of all the parties to the new contract; [3] the extinguishment of the old contract; and [4] the validity of the new contract." *Id.* (quoting *Phillips & Arnold, Inc. v. Frederick J. Borgsmiller, Inc.*, 123 Ill. App. 3d 95 (1984). "For there to be a novation, the obligee must assent to the substitution and agree to release the obligor." *Id.* at 928-29.

But the Debtor does not explain which existing obligations were supposedly extinguished and what new contract was supposedly formed. At best, Pride Aircraft would appear to suggest that an October 2019 agreement between GRAA and the

Page **14** of **16**

Debtor for the Debtor's rent-free use of the so-called Flightline property through 2024 in return for the abandonment of Plot No. 19 is a novation of the sublease of Plot No. 19 between HSI and the Debtor.  Missing from this argument, however, is the allegation, let alone proof, that HSI assented to the substitution and agreed to release the Debtor of its obligations to HSI under the Plot No. 19 sublease.  Moreover, the Debtor does not show how such supposed new agreement related to Plot No. 28 or gave the Debtor the right to continue to occupy Plot No. 28.  At best, the Debtor seems to suggest that, because the arrangement to use the Flightline building coincided with the April 1, 2024 expiration date of the Plot No. 28 Net Ground Lease to HSI, the Debtor was somehow led to believe that the Plot No. 28 lease would not be terminated before 2024.  But, again, the Debtor fails to explain how such a belief would give it the right to reinstate the lease or sublease of Plot No. 28 after the termination agreement.  The Debtor did not provide any evidence of any direct written lease agreement between it and GRAA with respect to Plot No. 28.  Therefore, without prejudice to any future claim of "novation" in this or another court, the court finds that the Debtor has failed to rebut GRAA's showing of cause and to otherwise demonstrate grounds for denying the request for relief from the stay to permit GRAA to pursue the eviction of the Debtor from Plot No. 28.  Of course, such a determination here does not preclude the Debtor from raising such defenses or others that it may have in any state court eviction proceeding that may follow.

## CONCLUSION

For the reasons set forth herein, GRAA's Motion for Relief from the Automatic Stay with respect to Aviation Plot No. 28 at the Greater Rockford Airport is granted, and GRAA will be permitted to pursue eviction of the Debtor or other *in rem* relief with respect to its rights in Plot No. 28. However, this ruling does not allow GRAA to pursue any *in personum* claims against the Debtor or against other property of the bankruptcy estate. A separate order shall be entered giving effect to the determinations reached herein.

DATE: October 30, 2020

        ENTER:

*/s/ Thomas M. Lynch*
Thomas M. Lynch
United States Bankruptcy Judge